UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FLOYD SHAW,

          Movant,

             v.

UNITED STATES OF AMERICA,

          Respondent.

_____/

Criminal Case No. 15-20624-2
Civil Case No. 17-13093

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
DAVID R. GRAND

### ORDER ADOPTING REPORT AND RECOMMENDATION [268]; OVERRULING MOVANT'S OBJECTIONS [270]; DENYING MOVANT'S MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255 [195]

The Government presented Floyd Shaw, a 20-year-old with no felony record, with a Hobson's choice[1]: plead guilty to Conspiracy to Distribute and Possession with Intent to Distribute Heroin and serve at least fifteen years in prison under the plea agreement; or, proceed to trial on additional counts and face the possibility of

_____

[1] A "Hobson's choice" is an apparently free choice where there is no real alternative. The term originated in England in the early 1600s, where a man named Thomas Hobson worked as a licensed carrier. Hobson kept horses to carry goods between Cambridge and London and rented them to university students. Students had their favorite horses. In an effort to prevent those horses from being overworked, Hobson used a rotation system which gave each customer the choice of taking the horse closest to the stable door or no horse at all. This method became known as Hobson's choice. *Hobson's Choice*, MERRIAM-WEBSTER (last visited Oct. 29, 2020), https://www.merriam-webster.com/dictionary/Hobson's%20choice.

serving up to life in prison. Relying, in part, on his attorney's advice, Mr. Shaw chose the former. Second-guessing his decision, Mr. Shaw brings this Motion to Vacate Sentence [195] pursuant to 28 U.S.C. § 2255 for relief.

Mr. Shaw filed the instant Motion to Vacate Sentence [195] on September 20, 2017. On April 23, 2018, Mr. Shaw's attorney, Peter Kelley, filed an Affidavit [228] concerning his representation of Mr. Shaw. The Government filed a Response [229] incorporating Mr. Kelley's Affidavit on April 27, 2018. Mr. Shaw filed a Motion for Leave to Amend [230] on April 27, 2018. He also filed a Declaration [235] in response to Mr. Kelley's Affidavit on May 25, 2018. On August 8, 2018, the Court denied in part Mr. Shaw's Motion to Vacate Sentence [195], leaving the remaining issue of whether Mr. Shaw instructed his counsel to file a notice of appeal to be decided after an evidentiary hearing.

On October 3, 2019, the Magistrate Judge held an evidentiary hearing. On October 28, 2019 and November 25, 2019, Mr. Shaw and the Government respectively submitted Supplemental Briefs [260] [263]. On April 3, 2020, the Magistrate Judge issued a Report and Recommendation ("R&R") [268] recommending that the Court deny the Movant's motion. Mr. Shaw filed Objections [270] to the R&R on April 30, 2020. The Government filed a Response [272] on May 14, 2020.

For the reasons stated below, the R&R [268] is **ADOPTED**; Movant's Objections [270] are **OVERULLED**; and the Movant's Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 [195] is **DENIED.**

## FACTUAL AND PROCEDURAL BACKGROUND

The Court adopts the facts of this case as set forth in the R&R:

### a. The Charges against Shaw

When he pleaded guilty on April 7, 2016, Shaw was facing a slew of serious charges in a Superseding Indictment, including: Conspiracy to Distribute and to Possess with Intent to Distribute Heroin (Count I); Conspiracy to Distribute and to Possess with Intent to Distribute Heroin Within 1000 Feet of an Outdoor Facility Containing a Playground (Count III); Distribution of Heroin Resulting in Serious Bodily Injury (Counts VI and VIII); Distribution of Heroin (Count VII); Conspiracy to Possess Firearms in Furtherance of a Drug Trafficking Crime (Count XIII); Possession with Intent to Distribute Heroin; Aiding & Abetting (Counts XIV and XIX); and Possession of a Firearm in Furtherance of Drug Trafficking Crime; Aiding & Abetting (Count XV). The penalties, should Shaw be convicted of all of these charges, were quite massive, as he was facing potentially many decades in prison. Counts VI and VIII alone each carried mandatory minimum 20-year sentences, and Count XV carried a mandatory minimum sentence of 5 years, which would need to be served consecutively to any other term of incarceration. (ECF No. 100).

### b. Rule 11 Plea Agreement and Plea Hearing

Pursuant to a Rule 11 Plea Agreement (the "Plea Agreement"), Shaw pleaded guilty to Count I of the Superseding Indictment in exchange for the government's agreement to dismiss the other charges and its agreement for a sentencing range on Count I of 180-240 months. The Plea Agreement provided a factual basis for certain "relevant conduct," including that Shaw had "knowingly and intentionally distributed a mixture and substance containing a detectable amount of

heroin . . .which distribution resulted in the serious bodily injury" of two other persons, J.L. and J.H. (ECF No. 115, PageID.291-92). The Plea Agreement also contained an Appeal Waiver provision, pursuant to which Shaw agreed to waive his right to appeal if he was sentenced within the agreed-upon range. (*Id.*, PageID.298). At the plea hearing, Shaw acknowledged that he was waiving his right to appeal in the event the Court imposed a sentence within that range. (ECF No. 217, PageID.1191).

Judge Tarnow found that Shaw's plea had been entered into voluntarily, but Judge Tarnow took the Plea Agreement under advisement, noting he is "not a big fan of the Prosecutor deciding what the minimum sentence has to be or can be." (*Id.,*PageID.1203). Importantly, however, the Plea Agreement provided that if Judge Tarnow imposed a sentence below the range that Shaw and the government had agreed upon, the government could have withdrawn from the plea and proceeded to trial as to all of the charges against Shaw. (ECF No. 115, PageID.298). Again, were Shaw to have been convicted on all of those charges, he would have faced a potentially decades-long sentence.

### c. Sentencing Hearing

Shaw's sentencing hearing took place on October 3, 2016. The Presentence Report reflected a Sentencing Guideline range of 210-262 months (17 years, 6 months - 21 years, 10 months). (ECF No. 180, PageID.826). The government recommended a sentence of 180 months (15 years), which was the lowest sentence authorized under the Plea Agreement. (*Id.*, PageID.829). The Government did not file a § 5K1.1 motion for reduction of sentence. (*Id.*, PageID.830). On Shaw's behalf, attorney Kelley asked the Court to "fashion a sentence that the Court finds to be appropriate . . . somewhere between . . . the five year sentence and the sentence of 180 months." (*Id.*, PageID.832-33). However, as Kelley acknowledged, and the government's counsel confirmed in no uncertain terms, if Judge Tarnow sentenced Shaw to a sentence less than the 180-month minimum sentence reflected in the Plea Agreement, the government *would* exercise its right to void that Agreement and proceed to trial against Shaw on all of the charges against him. (*Id.,* PageID.836) (". . . the Court must accept the 180 months floor to the sentence or the Government will void the

agreement."). Ultimately, Judge Tarnow sentenced Shaw to 180 months (15 years) in prison. (*Id.*, PageID.850; ECF No. 161). Judge Tarnow allowed Shaw to self-surrender to the United States Marshal to begin serving his custodial sentence on a date to be determined. (ECF No. 161, PageID.752).

Judge Tarnow advised Shaw that he had the right to appeal, but that pursuant to his Plea Agreement he gave up that right. (ECF No. 180, PageID.853). Nevertheless, Judge Tarnow advised Shaw that his attorney could "talk to the case manager and he will get you the forms to ask for an appellate lawyer and transcript and filings if any." (*Id.*). Judge Tarnow also noted that Shaw's chances of success on appeal were "very, very slim." (*Id.*). Shaw did not make any statement on the record about wanting to appeal his sentence.

### d. Post-Sentencing Bond Revocation Hearing

Shaw immediately began violating the terms of his bond, specifically its curfew condition. (ECF No. 163). After a series of curfew violations, Judge Tarnow set a bond review hearing for November 21, 2016. (*Id.*). Shaw appeared at the hearing and admitted the violations. (ECF No. 218, PageID.1210). Judge Tarnow permitted Shaw to voluntarily turn himself in to the U.S. Marshal's "lockup" immediately following the hearing, and advised him that if he failed to do so, he would be ordered remanded to Marshal custody (as opposed to self-reporting), which could negatively impact his prison classification. (*Id.*, PageID.1213-14). Shaw and Kelley agree that the two left the courtroom and walked together to the Marshal's lockup for Shaw to turn himself in and begin serving his custodial sentence.

### e. Shaw's § 2255 Motion

On September 20, 2017, Shaw filed his instant Motion to Vacate and Correct Sentence pursuant to 28 U.S.C. § 2255. (ECF No. 195). The only remaining claim in Shaw's motion is his claim that Kelley provided ineffective assistance of counsel "for failing to appeal the [180-month] sentence . . ." (*Id.*, PageID.957). Specifically, Shaw alleges in his motion that when he and Kelley "walked out the door" of Judge Tarnow's chambers after his sentencing, Shaw instructed Kelley "to file a [sic] appeal." (*Id.*).

After securing an order finding that Shaw had waived the attorney-client privilege as to the issues raised in his § 2255 motion (ECF No. 227), Kelley submitted an affidavit in which he responded to Shaw's contention that Shaw had asked him to file an appeal immediately following the sentencing hearing:

> No discussion occurred after Sentencing concerning the issue of an appeal. Per Ground Two of [Shaw's] §2255 petition, he states, "ineffective assistance of counsel during for failing to appeal the sentence when we walked out the door, I told him to file a appeal." If, as I was going out the door, I heard [Shaw] say "file an appeal", I would have stopped and immediately taken him with me to Mr. Lang, the Judge's Clerk, and seen that the appropriate papers were filed. No such request was made of me or of the Court and the Court gave [Shaw] sufficient notice of the need to file an appeal and how to do it under Federal Rules of Procedure, Rule 32. . . .

(ECF No. 228, PageID.1257-58).

Shaw filed a declaration in response to Kelley's affidavit in which he averred:

> My clear recollection of the events following imposition of my sentence was that when we left the courtroom, I indicated to [Kelley] that I wanted him to file an appeal. Under the penalty of perjury, I reaffirm this attestation. For Mr. Kelley to say to the contrary that he would have immediately stopped and taken me to the Judge's clerk and seen that the appropriate papers were filed is preposterous. A more believable and reasonable response based on actual practice would have been for him to simply discuss with a client and merely electronically file the notice of the appeal with the clerk of court – not to physically take a defendant with him to the Judge's clerk to file said paperwork.[2]

---

[2] Although an electronic filing might be more conventional, far from being "preposterous," as noted above, *supra* at 6, Judge Tarnow suggested exactly such an approach at the sentencing hearing's conclusion when he reminded Shaw of his right to appeal. (ECF No. 180, PageID.853; ECF 222) ("If you choose to challenge whether [the Plea Agreement's appeal waiver provision] is

Further, if my memory serves me correctly, he indicated that he would file such notice within 14-days following my sentencing. I can't remember exactly where and when this discussion occurred, but I do recall him informing me of this within one or two days post sentencing.

It is true that post-sentencing, I did in fact discuss other issues with my attorney as it related to my release on bond. The reason I did not discuss the appeal, was because I was left with the impression that [Kelley] had acted on my earlier and original request to file the notice of appeal, on the day immediately following imposition of my sentence. I did not see the need to bring it up again.

As a person unfamiliar with the law and it's [sic] related proceedings and procedures, I assumed my attorney did what I had requested of him with respect to filing the requested notice of appeal challenging the firearm and bodily injury aspects of my charged offense conduct.

(ECF No. 235, PageID.1316).

### f. *Evidentiary Hearing*

The undersigned held an evidentiary hearing on Shaw's § 2255 motion on October 3, 2019. Shaw testified on his own behalf, as did his mother, Harriet Shaw ("Harriet"), and his stepmother, Sharee Mathis ("Mathis"), both of whom had attended Shaw's sentencing. The government called as witnesses attorney Kelley and his wife, Catharine Kelley ("Catharine"), who also happened to be present at Shaw's sentencing.

### i. *Petitioner Floyd Shaw's Testimony*

---

a valid provision or not your attorney can talk to the case manager and he will get you the forms to ask for an appellate lawyer and transcript and filings if any."). And, as discussed below, *infra* at 12, Kelley testified he had utilized this in-person approach of filing a notice of appeal "a number of times." (Tr. 1476).

Shaw testified as follows. He was "upset" with the sentence imposed by Judge Tarnow. (Tr. 1435). The "first time" he asked Kelley to file a notice of appeal was in the hallway outside of Judge Tarnow's chambers "as soon as [they] came out of the courtroom" following his sentencing hearing. (Tr. 1436-37).[3] Shaw 's mother, father, stepmother, and ex-girlfriend were all present when he made that request, as was attorney Kelley's wife, Catharine. (Tr. 1437-38). Kelley responded that he "would get on it." (Tr. 1438). After the sentencing hearing, Shaw went upstairs to the Court's Probation Department to "drop a urine [sample]." (Tr. 1435-36). When he came back downstairs, Shaw asked Kelley "again" about an appeal. (*Id.*).

Shaw did not speak to Kelley between that point and his bond revocation hearing a few weeks later. (Tr. 1438). Shaw tried calling Kelley's cell phone at least four times during those intervening weeks, but never reached him. (Tr. 1438-39).[4] After the bond revocation hearing, as Shaw and Kelley were walking to the Marshal's lockup, Shaw "asked [Kelley] what was going on with [his] appeal, and [Kelley] said, I couldn't file the appeal, just those were his exact words, 'I couldn't file the appeal.'" (Tr. 1439). Shaw did not ask Kelley why he couldn't file the appeal, and "then went on and turned [himself] into the marshals." (*Id.*). Shaw attempted to file an appeal once he got to prison. (Tr. 1439).[5] Finally, Shaw acknowledged that in his § 2255 motion, the only mention he made of asking Kelley about an appeal was immediately after they left the sentencing hearing, and that he did not mention asking Kelley about that after he provided the urine sample or as he and Kelley were walking to the Marshal's lockup a few weeks later. (Tr. 1453). However, Shaw reiterated that he "did [] ask Mr. Kelley to do an appeal all three of those times." (Tr. 1453-54).

### ii.   *Harriet Shaw's Testimony*

Shaw's mother, Harriet, was present at his sentencing. At the evidentiary hearing in this matter, she testified that after the sentencing, she, Shaw and the others in attendance went into the hallway and sat on the benches, close enough to hear each other. (Tr. 1457-59). They all

---

[3] Shaw says this is the first time he and Kelley had any discussions about an appeal. (Tr. 1440). However, Shaw admits that the Plea Agreement contains provisions regarding his appeal rights, and that he discussed the Plea Agreement with Kelley before signing it. (Tr. 1442).

[4] Shaw did not provide telephone records to corroborate this allegation.

[5] Shaw did not provide any documentation supporting this contention.

talked, and she heard Shaw ask Kelley to file an appeal, and heard Kelley say he would do so. (Tr. 1458-59). She also testified that she heard Shaw ask Kelley to file an appeal "one day" when Shaw and Kelley spoke on the phone. (Tr. 1459, 1463).

### iii.   Sharee Mathis' Testimony

Shaw's stepmother, Sharee Mathis, was present at Shaw's sentencing. She testified at the evidentiary hearing that after the sentencing, she, Shaw and the others were all sitting on a bench outside Judge Tarnow's courtroom. (Tr. 1466). They were sitting close enough to hear each other. (1466-67). She heard Shaw state "that he wanted to file the appeal." (Tr. 1467). She testified that Kelley "said he would file the appeal." (*Id.*).

### iv.   Attorney Peter Kelley's Testimony

Shaw's trial counsel, Peter Kelley, testified as the government's first witness as follows. He is a criminal defense attorney, and has been practicing law for 45-plus years. (Tr. 1471). Kelley had advised Shaw to call him "day or night" if he had concerns, and Shaw had, in fact, called Kelley's cell phone "sometimes" during his representation. (Tr. 1472). As he does with all of his clients, he explained to Shaw at the outset of their relationship that he would only be handling Shaw's case through trial, but that if Shaw wished to appeal, he would assist Shaw in obtaining counsel for that purpose. (Tr. 1472-73, 1488). Kelley spoke to Shaw a number of times during the case about Shaw's rights to appeal. (Tr. 1488).

When Shaw was contemplating the Rule 11 Plea Agreement, Kelley explained to him that it contained an appeal waiver provision, and that as a result "the issues that the Court of Appeals would look at under those circumstances was very, very narrow and, if anything, would be limited to interpretation of the guidelines or issues of that sort, and that there were some other rare exceptions." (Tr. 1473). Kelley also advised Shaw "that the appeal needed to be filed right after sentencing, immediately, or within 14 days . . ." (*Id.*).

Kelley testified that had Shaw asked him to file a notice of appeal he would have had no reason not to follow those instructions, and in

fact, would have followed those instructions even if he felt an appeal had no merit. (Tr. 1476-77). Kelley testified, "My job would have been to see that it was filed, and I would have done that immediately." (Tr. 1477). In fact, Kelley testified, "I've done it a number of times and merely you go to the clerk and you fill out the form . . . and the client could be right - - he could have been with me right then, yes." (Tr. 1476; *see also* Tr. 1491).

Kelley was then asked, point blank, "did Mr. Shaw ever ask you to file a notice of appeal?" and he answered, "Never." (Tr. 1477; *see also* Tr. 1481). The government's counsel asked the same question regarding different time frames – "Before sentencing,?" "During the course of sentencing?," "After sentencing?" – with Kelley answering each time in the negative. (*Id.*; *see also* Tr. 1487-88).

Later during his testimony, Kelley was asked about Shaw's post-sentencing bond review hearing. (Tr. 1478-80). Kelley testified that he and Shaw had time to talk as they walked from the hearing to the Marshal's lockup, but that Shaw made no mention of having tried to get in touch with Kelley, and did not ask Kelley to file a notice of appeal. (*Id.*).

The testimony also included Kelley sharing his subjective observations of Shaw's reaction to his sentence. Kelley testified that immediately following the sentencing hearing, Shaw "was disappointed, I would say more than disappointed, and was, when I walked him . . . outside of Judge Tarnow's courtroom, he turned his back on me and walked away. (Tr. 1481-82). Kelley further testified:

> **Q.** Were you thinking he might call you and ask you to file a notice of appeal?
> **A.** I awaited such a phone call.
>
> **Q.** And?
> **A.** I did not receive a phone call.
>
> **Q.** You thought he might because why, he was angry?
> **A.** He -- at the sentencing, he expressed that he was upset.

(Tr. 1477-78).

Shaw's counsel cross-examined Kelley about this testimony, and the Court had some questions, as well:

> Q.   And at the time of sentencing, you were there with Mr. Shaw, correct?
>
> A.   That is correct.
>
> Q.   And he was upset about the sentence he was given, correct?
>
> A.   Yes.
>
> Q.   Because you had told him there was a chance he could get five years?
>
> A.   I don't believe I told him that he could get five years. I said somewhere between 5 and 180, and if you read my arguments to Judge Tarnow, they're set forth in that area.
>
> * * *
>
> Q.   You stated in your argument to Judge Tarnow that Mr. Shaw had a hard time understanding the concept of foreseeability with regards to the possession of the firearm and the great bodily harm and how that would impact his sentence, correct?
>
> A.   It's called relevant conduct, right.
>
> Q.   Right?
>
> A.   Yes.
>
> Q.   And as a result, you figured, according to your testimony just now, that he would -- you thought he would want to appeal because he didn't understand that, correct?
>
> A.   No.

**Q.**     You stated that you thought he would want to appeal, and you were expecting a phone call from him, correct, after the sentencing?

**A.**     Expressed by his anger. I was concerned that he might have an opportunity to think about that, decide whether he wanted to take the chance of the full plea being set aside, yes.

**THE COURT:** But did you expect him to call? I thought you had said that you were kind of -- I think your testimony was almost like awaiting a call?

**THE WITNESS:** Yes, yes, that's correct.

**BY [Shaw's counsel]:**

**Q.**     Did you ever reach out to him to discuss --

**A.**     No.

**Q.**     that?

**A.**     No.

**Q.**     You never called him or tried to schedule an appointment with him to discuss his right to appeal after the sentence?

**A.**     It was something I anticipated, but I did not pick up the phone and call him and I thought that he had -- his wisdom had allowed him to decide that this was the best way to go.

**Q.**     But you did expect it at the time?

**A.**     I said I did.

**Q.**     Okay.

**A.**     But my word was "anticipated." There's a difference I suspect.

**Q.**     Okay. And you've been doing this a long time, correct?

**A.**   That is correct.

**Q.**   So you have a good feel for when you would expect
or anticipate a defendant to call you after a sentence
to ask for an appeal?

**A.**   He was upset after the sentencing, that's my answer.

(Tr. 1484-87).

Finally, on re-direct examination, the following exchange occurred:

**Q.**   There was some discussion about whether you anticipated
a phone call after the sentencing about an appeal, and that
you indicated that you anticipated a phone call. Was that
because you believed he had a meritorious argument for
appeal?

**A.**   No. It simply was he was angry and I think that was the
fact that he would walk away from me when I came out
caused me to think that perhaps he would have an interest
in doing that.

**Q.**   You've represented numerous criminal defendants in
federal court and state court over the years?

**A.**   Yes.

**Q.**   Have there been others that were angry after sentencing?

**A.**   Yes.

**Q.**   Did you anticipate a phone call from them, too, about
possibly filing an appeal?

**A.**   Oftentimes it took a little time for things to percolate
before they decided to appeal, yes.

**Q.**   So that would have been consistent with your own
experience?

**A.**   That's correct.

(Tr. 1490-91).

v.    *Catharine's Kelley's Testimony*

Catharine Kelley is attorney Peter Kelley's wife, and she works as Kelley's assistant and is privy to his case files. (Tr. 1494). She attended Shaw's sentencing hearing. Catharine was asked, "do you recall Mr. Shaw ever saying anything about wanting your husband to file a notice of appeal?" (Tr. 1495). She answered, "No," though she also explained she waited to leave the courtroom until everyone else had done so and Kelley waved her out. (*Id.*).

## STANDARD OF REVIEW

The Court's review of objections to a Magistrate Judge's R&R on a dispositive motion is *de novo*. 28 U.S.C. § 636(b)(1)(c). "'[O]bjections disput[ing] the correctness of the magistrate's recommendation but fail[ing] to specify the findings . . . believed in error' are too general." *Novak v. Prison Health Services, Inc.*, No. 13-11065, 2014 WL 988942, at *3 (E.D. Mich. Mar. 13, 2014) (quoting *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995)). Ordinarily, objections that lack specificity do not receive de novo review. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). In addition, the Court may accept, reject, or modify any or all of the Magistrate Judge's findings or recommendations. FED. R. CIV. P. 72(b)(3).

## LEGAL STANDARD

To succeed on a motion to vacate, set aside, or correct a sentence, a movant must allege "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Pough v. United States*, 442 F.3d 959, 964 (6th Cir.

2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)). Mr. Shaw alleges an error of constitutional magnitude: his counsel's failure to file a notice of appeal.

To establish ineffective assistance of counsel, Mr. Shaw must demonstrate that defense counsel: 1) rendered deficient performance; and 2) prejudiced the movant's defense, so as to render the outcome of the proceedings unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

"The performance prong of *Strickland* requires a defendant to show that counsel's representation fell below an objective standard of reasonableness." *United States v. Pola*, 703 F. App'x 414, 417 (6th Cir. 2017) (internal citation and quotation marks omitted). Additionally, where a movant who has pleaded guilty establishes that counsel was deficient, he must also show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

"Counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Roe v. Flores-Ortega*, 528 U.S. 470, 480 (2000). When counsel's constitutionally deficient performance prevents a defendant from

filing an appeal he "otherwise would have taken," prejudice is presumed, "regardless of whether the defendant has signed an appeal waiver." *Garza v. Idaho*, 139 S. Ct. 738, 747, 203 L. Ed. 2d 77 (2019) (quoting *Flores-Ortega*, 528 U.S. at 484). An appeal waiver "does not complicate" this presumption, because "counsel's deficiency forfeits an 'appellate proceeding altogether'" and "there is no disciplined way to 'accord any 'presumption of reliability' . . . to judicial proceedings that never took place." *Id.* (quoting *Flores-Ortega*, 528 U.S. at 483).

Accordingly, "even when a defendant waives all or most of his right to appeal, an attorney who fails to file an appeal that a criminal defendant explicitly requests has, as a matter of law, provided ineffective assistance of counsel that entitles the defendant to relief in the form of a delayed appeal." *Campbell v. United States*, 686 F.3d 353, 360 (6th Cir. 2012).

## ANALYSIS

**Objection 1:** "The Court Should Find that Mr. Shaw Expressly Instructed Kelley to File a Notice of Appeal and that Mr. Kelley's Testimony lacks credibility when compared to testimony from Mr. Shaw's, Ms. Harriet Shaw's and Ms. Sharee Mathis." (ECF No. 270, PageID. 1627).

The Magistrate Judge concluded that Mr. Shaw failed to show that he expressly instructed Mr. Kelley to file a notice of appeal. Mr. Shaw argues that this conclusion was based on "arbitrary" findings and lacked evidence. (*Id.* at 1629). He also claims that Mr. Kelley's testimony was not credible, because it "appears to be

that of someone attempting to cover for his own mistake." (*Id.* at 1631). The Court's review of the testimony leads it to conclude otherwise.

This case presents a classic he said versus she said tale of events. Both sets of witnesses have strong incentives to lie: one to protect the reputation of a 45-year career, and the other to avoid, or at least have a chance at reducing, a 15-year prison sentence. In a case of such diverging stories, credibility must be determined through evaluating corroborating evidence and inconsistent testimony, while keeping in mind that Mr. Shaw, as the petitioner, holds the burden of proof. Through this evaluation, the Court concurs with the Magistrate Judge's conclusion.

The Magistrate Judge identified several pieces of evidence that failed to corroborate Mr. Shaw's telling of events. Chief among them is Mr. Shaw's inconsistent testimony about when and how many times he asked Mr. Kelley to file an appeal. Mr. Shaw states, in both his Motion to Vacate Sentence [195] and supporting Declaration [235], that he asked Mr. Kelley to file an appeal only *once* immediately following the sentencing hearing. (ECF No. 195, PageID. 957; ECF No. 235, PageID. 1316). In fact, in his Declaration, Mr. Shaw goes so far as to say that he did not discuss the appeal with Mr. Kelley "post-sentencing" and "did not see the need to bring it up again," because he assumed that Mr. Kelley acted upon his earlier request. (ECF No. 235, PageID. 1316-17). However, during the evidentiary hearing, Mr. Shaw testifies to not only asking Mr. Kelley to file an appeal

*three* times, twice immediately after the sentencing and once at the bond hearing, but also calling him at least *four* times between his sentencing and bond hearing. (EH Tr. 1436-38). Further, Mr. Shaw's Declaration states that "one or two days post sentencing" Mr. Kelley informed him that he would file an appeal. (ECF No. 235, PageID. 1316). While at the evidentiary hearing, Mr. Shaw claims that Mr. Kelley told him immediately upon being asked that he would "get on it." (EH. Tr. 1438).

Mr. Shaw's mother also complicates the picture by testifying, with no supporting evidence, that she heard Mr. Shaw ask Mr. Kelley on the phone to file an appeal. (EH. Tr. 1459). This directly contradicts Mr. Shaw's testimony that Mr. Kelley never answered his phone calls. Moreover, Mr. Shaw failed to file any phone records to buttress his claim that he called Mr. Kelley several times to no avail.

Ultimately, Mr. Shaw has the burden of proving that he explicitly asked Mr. Kelley to file an appeal. When two parties present equally credible evidence, the party with the burden of proof must lose. Even if the Court concluded that inconsistencies in his evidence merely amount to innocuous memory loss, and disregarded all of the reasons to doubt Mr. Shaw's claims, he has still failed to carry his burden, because he failed to tip the scales in his favor. For these reasons, the Court finds that Mr. Shaw has failed to prove that he explicitly asked Mr. Kelley to file an appeal. The objection is overruled.

**Objection 2:** "The Court Should Find that Mr. Shaw Can Prevail on the Theory that Kelley Violated a Constitutional Duty to Consult with Him about an Appeal." (ECF No. 270, PageID. 1632).

Under *Flores-Ortega*, although Mr. Shaw did not explicitly instruct Mr. Kelley to file an appeal, he can still succeed on his §2255 claim by proving that Mr. Kelley failed to consult with him about an appeal. *Flores-Ortega*, 528 U.S. at 478. This consultation must advise "the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Id.* If counsel did not consult with the defendant, such as here, then the Court can conclude that this constituted deficient performance "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." (*Id.* at 480). "To determine whether these circumstances are present in this case, courts must consider all relevant factors such as whether the defendant pleaded guilty and whether the defendant received a much longer sentence than anticipated." *Jenkins v. United States*, No. 16-CR-20229, 2019 WL 3081074, at *4 (E.D. Mich. July 15, 2019). The Magistrate Judge concluded that Mr. Shaw failed on both grounds. Petitioner concedes the former finding and objects to the latter. For the reasons stated below, the objection is overruled.

The Court finds that Mr. Shaw did not reasonably demonstrate his interest in appealing to Mr. Kelley. *Flores-Ortega* points the Court to several factors that should be considered in this inquiry, including whether the conviction follows a guilty plea "both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings", and if so, whether the petitioner "received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights." *Flores-Ortega*, 528 U.S. at 480. As the Magistrate Judge explains, all of these factors weigh against Mr. Shaw. He pled guilty to one out of nine charges, which carried a 210-262 month guideline range. In exchange the Government dismissed his remaining charges and the parties agreed to a 180-240 month guideline range**.** At sentencing, Mr. Shaw received a 180-months sentence. Additionally, Mr. Shaw expressly waived his appeal rights in his plea agreement.

Although these factors did not foreclose Mr. Shaw's ability to appeal, they do inform the Court as to what counsel knew at the time of sentencing. *See Wright v. United States*, 320 F. App'x 421, 425 (6th Cir. 2009) (holding that petitioner "failed to show that there was reason for his counsel to think that [he] would have wanted to appeal" when he pled guilty, received the sentence he bargained for, and waived his rights to appeal); *see also Ahart v. Bradshaw*, 122 F. App'x 188, 194 (6th Cir.

2005) ("[l]ooking at the plea agreement in its entirety, we conclude that it was not unreasonable for counsel not to consult with [petitioner] about an appeal given that [he received] what he expected to receive by entering into the plea agreement."); *see also United States v. Peacock*, No. 15-20010-2, 2019 WL 1379976, at *5 (E.D. Mich. Mar. 27, 2019) (finding that counsel did not have a duty to consult with petitioner regarding filing an appeal when defendant received a bargained for sentence "well under the guideline range" and signed an appeal waiver). Considering the totality of Mr. Shaw's circumstances, it was not unreasonable for his attorney to not consult him regarding filing an appeal.

Despite this, Mr. Shaw points to evidence in the record as proof that he reasonably demonstrated his interest in appealing. He claims that although he agreed to a sentence between 180 and 240 months, Mr. Kelley told him that he could receive a sentence "somewhere between 5 [years] and 180 [months]" and even argued for this variance at sentencing. (EH Tr. 1485); (SH Tr. 831-32). But after Mr. Shaw received 180 months, he was "more than disappointed" after the sentencing hearing when he did not get a sentence closer to 5 years. (EH Tr. 1481-82). Shaw notes that his attorney testified that he thought Shaw would think about appealing and call him with a decision. (EH Tr. 1478-79). The Court recognizes that as a 20-year-old facing a 15-year sentence, Mr. Shaw was understandably upset. However, this alone cannot

reasonably demonstrate an interest in appealing. *See Rojas-Medina v. United States*, 924 F.3d 9, 17 (1st Cir. 2019) (collecting cases) ("a defendant must have done more than merely express his displeasure at sentencing" to reasonably demonstrate an interest in appealing); *see also United States v. Cong Van Pham*, 722 F.3d 320, 325 (5th Cir. 2013) (finding that reasonable demonstration requires more "than merely expressing unhappiness at a sentencing hearing.") (citing *Jackson v. Attorney Gen. of Nevada*, 268 F. App'x 615, 620 (9th Cir. 2008)); *see also Jackson*, 268 F. App'x at 620 ("[n]either *Flores-Ortega* nor any other Supreme Court precedent establishes that merely expressing unhappiness at a sentencing hearing is sufficient to reasonably demonstrate an interest in appealing"). The Court agrees with the weight of this persuasive precedent. Because Mr. Shaw received the sentence he bargained for after pleading guilty and he failed to show more than just his disappointment after sentencing, the Court finds that Mr. Kelley did not display deficient performance for failing to consult with Mr. Shaw regarding filing an appeal.

Assuming arguendo that Mr. Shaw could show deficiency, he must then also prove prejudice. *Flores-Ortega* holds that "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal." *Flores-Ortega*, 528 U.S. at 484. The Court further

explains that "to show prejudice in these circumstances, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id*. In *Garza*, the U.S. Supreme Court reaffirmed this holding and added that prejudice is presumed "regardless of whether the defendant has signed an appeal waiver." 139 S.Ct. 738, 747 (2019). This means that despite Mr. Shaw's admittedly low probability of success on appeal, he need not make a "further showing" of the merits of his claims. He only needs to show that if he had "received reasonable advice from counsel about the appeal, he *would have* instructed his counsel to file an appeal." *Id*; *Flores-Ortega*, 528 U.S. at 486 (emphasis added).

Mr. Shaw has not made this showing. Proving prejudice requires additional evidence beyond what the petitioner relies on to prove reasonable demonstrated interest. "Whereas the deficient assistance component is satisfied if the defendant can prove that he expressed 'an interest' in appealing, the actual prejudice component requires something more, to wit: proof that he 'would have' appealed had he been consulted." *United States v. Lovell*, 83 F. App'x 754, 758–59 (6th Cir. 2003) (citing *Flores-Ortega*, 528 U.S. at 586).  Mr. Shaw has not done so here. He merely argues that he attempted to file a *pro se* appeal from prison. However, no appeal was ever filed. This is similar to the facts in *Johnson v. United States*, where

the Sixth Circuit did not find prejudice when the petitioner "knew that any appeal had little chance of success[,] . . . was fully informed of his right to appeal," and yet failed to contact his attorney in time to file one. 364 F. App'x 972, 977 (6th Cir. 2010). Here, the Court informed Shaw at sentencing that although he had a limited right to appeal his conviction, his chances of success were "very, very slim." (SH Tr. 853). Furthermore, Mr. Shaw has not shown that if counseled by Mr. Kelley, he would have been advised to appeal. It is not difficult to see why. The consequences of appealing would have been futile at best or detrimental at worst. One of two results would have occurred: the Court of Appeals would have dismissed the appeal prior to briefing upon reviewing Mr. Shaw's Rule 11 agreement appeal waiver or the Government would have reinstated the eight previously dismissed charges against Mr. Shaw, re-exposing him to a 35-year to life prison sentence. The Court finds that, considering these possible outcomes, had Mr. Kelley consulted with Mr. Shaw, he would not have decided to file an appeal. Therefore, he has not demonstrated a reasonable probability that, "but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Flores-Ortega*, 528 U.S. at 484.

Mr. Shaw's case is emblematic of the breakdown of our justice system's sentencing structure. The Post-*Booker* sentencing system gave judges discretion to

use sentencing guidelines, supplemented by congressional factors, as discretionary tools to determine the appropriate sentence. Informed by the knowledge that decades of social science has revealed — that crime does not persist in a vacuum — these factors account for a defendant's human qualities, rather than just criminal. They include both the nature and seriousness of an offense as well as the history and characteristics of a defendant. 18 U.S.C. § 3553(a). In this process, judges look to detailed pre-sentence reports, prepared by probation officers, to consider the complex influence of a defendant's family history, personal trauma, substance abuse, mental health, and poor choices on his or her journey to criminal prosecution. Each one must be fairly and thoroughly evaluated in order to determine a sentence for an individual that is "sufficient, but not greater than necessary." *Id.* However, impositions of charges that carry mandatory minimums remove this vital sentencing discretion from judges and places it with prosecutors. This concern is not new. In fact, *Booker* bestowed the aforementioned discretion upon judges partly due to the looming and "troubling consequences with respect to prosecutorial power." *U.S. v. Booker*, 543 U.S. 220, 256 (2005). *Booker* recognized that "any factor that a prosecutor chose not to charge at the plea negotiation would be placed beyond the reach of the judge entirely. Prosecutors would thus exercise a power the Sentencing Act vested in judges: the power to decide, based on relevant information about the offense and the offender, which defendants merit heavier punishment." *Id.* at 257.

Despite these concerns, prosecutors still improperly wield the power to sentence through their power to charge a defendant with crimes that carry significant mandatory minimums. This power also strips defendants of any little negotiating power they once had, leaving them to choose between two diametrical positions.

This weakened position has become so ubiquitous in our nation's system of justice that it has its own name – "the trial tax." A trial tax occurs when a defendant decides not to plead guilty to a lesser count and elects to proceed to trial at the risk of receiving the full weight of stacked mandatory minimums, if found guilty. *See* Paige A. Nutini, *What Practitioners Should Know About Navigating the Prosecutor's "Trial Tax"*, American Bar Association (Apr. 25, 2019), https://www.americanbar.org/groups/litigation/committees/commercial-business/practice/2019/operation-varsity-blues-plea-deals-trial-tax/. Experts note that defendants who are convicted at trial consistently receive harsher punishments than defendants who plead guilty. Brian D. Johnson, *Trials and Tribulations: The Trial Tax and the Process of Punishment*, 48 Crime & Just. 313, 314 (2019). "Estimates of the trial tax vary but typically involve two-to-six fold increases in the odds of imprisonment with 15-60 percent longer sentence lengths." *Id.* The prosecutor's power is particularly potent in federal courts "where US Attorneys can pressure reluctant defendants with an array of mandatory sentencing laws and

enhancements[,] . . . file superseding indictments if a defendant refuses to cooperate, and . . . control access to various types of mitigation, such as federal substantial assistance departures, which are available only at the prosecutor's request, and eligibility for 'safety valve' provisions, which authorize sentences below statutory minimums." *Id.* The hubris of a system where prosecutors routinely usurp a judge's sentencing discretion, is starkly contrasted by public statements by the U.S. Department of Justice, which indicated a shift away from mandatory minimums. *See* Press Release, U.S. Dep't of Justice, Dep't of Justice Announces First Step Act Implementation Progress (Apr. 8, 2019) (https://www.justice.gov/opa/pr/department-justice-announces-first-step-act-implementation-progress). Nevertheless, U.S. Attorneys in this district have stayed the course to destructive effect.

These charging decisions disproportionally disfavor minority defendants. Mr. Shaw is a young black man. His story is an unfortunate microcosm of a criminal justice system plagued by stark racial disparities. Statistics show that black Americans "are more likely than white Americans to be arrested; once arrested, they are more likely to be convicted; and once convicted, and they are more likely to experience lengthy prison sentences." *Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance*, The Sentencing Project (Mar.

2018), https://www.sentencingproject.org/publications/un-report-on-racial-disparities/. In our moment in history, these facts have become more widely known, however, they bear repeating in hopes that their inherent racism will overshadow their familiarity. When it comes to pleas and sentencing, black defendants, more so than their white counterparts, are stuck between a rock and a hard place. Black men are almost twice as likely to be charged with an offense carrying a mandatory minimum sentence. Sonja B. Starr, M. Marit Rehavi, *Mandatory Sentencing and Racial Disparity: Assessing the Role of Prosecutors and the Effects of Booker*, 123 Yale L.J., 28–29 (2013). As a result of this, as well as differential bargaining power, quality of plea offers, and distrust in the justice system, black defendants are more likely to go to trial. Brian D. Johnson, *Trials and Tribulations: The Trial Tax and the Process of Punishment*, 48 Crime & Just. 313, 335–36 (2019). Once sentenced, the prison terms of black defendants in the federal system are 20% longer than that of white defendants. *U.S. Sentencing Comm'n. Report on the Continuing Impact of United States v. Booker on Federal Sentencing*, (Jan. 30, 2013), http://www.ussc.gov/news/congressional-testimony-and-reports/booker-reports/report-continuing-impact-united-states-v-booker-federal-sentencing.

These outcomes have damaging ripple effects for not just an individual, but for entire communities. The civic duty and social responsibility that undergirds the prosecutor's position must catalyze them to face how their charging decisions impact

the future of our nation. The Court acknowledges that these disparities are also in part influenced by judges' discretion. However, in a system where the prosecutor's charging discretion has diminished the judge's sentencing discretion, the disparities that result are far more attributable to the outsized significance of the prosecutor's role.

Mr. Shaw's case highlights this outsized role. Although Mr. Shaw by all accounts was a low-level distributor, he was charged with nine counts, altogether carrying a sentence of 35 years to life. (ECF No. 70); 18 U.S.C. § 924 (c)(o); 21 U.S.C. § 841. His attorney attempted to "negotiate" from this inflated starting position. But how? Negotiation is meant to be a give and take discussion between parties who both have something to gain and something to lose. As a low-level distributor, Shaw had nothing to offer the Government. The FBI had already raided a house and seized several packages of heroin and crack cocaine, 28 cell phones, packaging material, scales, firearms, bullets, and business cards. PSR ¶14-15. Mr. Shaw's co-conspirators were in custody. And he had no knowledge of where the drugs were bought and shipped from. Mr. Shaw had nothing to offer the Government but himself. In the end, he pled guilty to the top charge which carried a guideline range sentence of 210-262 months. (ECF No. 115). That's 17 to 22 years for three years worth of low-level drug selling. (*Id.*) Evidenced by the Government's agreement to depart from the guideline range down to 180-240 months, not even the

prosecution thought this was just. (*Id.*) Unfortunately for Mr. Shaw, this sentence will stand. However, the Court hopes that prosecutors in this district and beyond will reevaluate their place in history.

CONCLUSION

Accordingly,

**IT IS ORDERED** that the R&R [268] **ADOPTED.**

**IT IS FURTHER ORDERED** that Movant's Objections [270] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Movant's Motion to Vacate and Correct Sentence [195] is **DENIED**.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: November 3, 2020                Senior United States District Judge